No. 25.—EMANUEL EZEKIEL, plaintiff in error, *vs.* GEORGE M. DIXON, defendant in error.

[1.] In construing a statute, the intention of the legislature is a fit and proper subject of inquiry. That intention, however, is to be collected from the act itself, and other acts upon the same matter.

[2.] When the language of a statute is clear, direct, and positive, leading to no absurd results, and affording a suitable, if not a sufficient remedy for an existing evil, courts should be governed by the obvious meaning and import of its terms.

[3.] If an insolvent debtor assigns his property to one or more persons, *in trust*, for the benefit of a portion of his creditors, to the exclusion of the rest, such conveyance is null and void by the act of 1818, as against those who are excluded.

Claim. Tried before Judge ALEXANDER. In Muscogee Superior Court. May Term, 1847.

Ezekiel levied an attachment sued out against one Nathan Lichton, upon certain merchandise, which was claimed by Dixon. Upon the trial, Dixon read in evidence a deed to himself and one Simon Lichton, executed by said Nathan Lichton, assigning the goods, wares and merchandise, to them, *in trust* for the benefit of certain specified creditors, who were to release Lichton from all further liability. (For a copy of this deed see the opinion delivered by the Supreme Court.) The plaintiff, Ezekiel, was not one of the creditors provided for by said deed. Some of the creditors named, but not all of them, had assented to the terms of the deed. Upon this state of facts the Court below charged the jury on the trial, that such a deed was not in violation of the act of 1818, unless a trust was reserved for the benefit of the seller, and if executed *bona fide* it was valid.

To which charge the plaintiff excepted.  The jury found for the claimant.

JOHNSON & WILLIAMS, and G. E. THOMAS, for plaintiff, made the following points.

1st. That said deed is void under the act of 1818, because it prefers some of the creditors to the exclusion of others.  *Prince,* 164, 165 ; 9 *Law Lib.* 45, 46, 57, 84, 85 ; *Hotchk.* 426.

2d. Because the assent of the creditors was had after the levy of the attachment.  7 *Ala. R. (new series)* 262.

3d. Because said deed contains a clause whereby a future benefit may accrue to said Lichton, in this; that if enough of the creditors do not accept and comply with the terms of said deed, to exhaust the property turned over, the residue will enure to the benefit of the defendant, or to his brother, one of the trustees.

4th. That the compensation to the trustees is unreasonable and unjust.

5th. That said deed is void for uncertainty.

In support of the first point they cited, 1 *Kelly R.* 157 *and* 176, in addition to the other authorities referred to.

JONES, BENNING & JONES, for claimant, the defendant in error, submitted the following points and authorities :

First. The act of 1818 can, by its title, extend only to assignments " of property," " to a portion of creditors," to the exclusion of others.  *Act of* 1818 ; *Prince,* 164.

2d. An assignment to trustees for creditors, is not the same thing as an assignment directly to creditors, particularly when, as in this case, the creditors are made *cestuis que trust* only of the *proceeds* of the thing assigned.

3d. But if it is the same thing, then this deed is saved by the proviso in said act of 1818.  *Prince,* 164, 165.

Second. But is not the deed in violation of some other law ?  for instance the 13th Eliz.  *Hotchk.* 424.  It is not, for—

1st. By the statute 13th Eliz., a debtor can make no assignment, " with intent to hinder, delay, or defraud, creditors.

2d. But he may by unconditional assignment prefer some creditors to others.  *Eastman* vs. *McAlpin,* 1 *Kelly,* 157; *Grover and others* vs. *Wakeman* ; 11 *Wendell,* 187.

3d. Therefore, an assignment unconditionally, preferring some creditors, is not one made " with intent to hinder, delay, or defraud creditors, within the 13th Eliz.

4th. Now an assignment unconditionally, preferring some creditors, is one unconditionally postponing others.

5th. But if creditors cannot say that a postponement of them, which was certain and unconditional, was made " with intent to hinder, &c., them," much more can they not say, that a postponement, which was only conditional and doubtful, was so intended. 11 *Wend*, 187, *supra ;* 2 *Bin.* 174 ; 3 *Price*, 6 ; 5 *Mass.* 42 ; 8 *Pick.* 63 ; 5 *id.* 28 ; 3 *Penns.* 86 ; 5 *Greenleaf,* 245 ; 2 *Stew.* 86 ; 3 *Watts*, 198 ; 2 *Paige*, 490.

6. And indeed a preference of some creditors, whether absolute or conditional, may as well be said to be intended to advance creditors as to " hinder" them.

Third. A creditor not preferred (as Ezekiel) cannot *complain* of these burdens laid upon the creditors preferred, particularly when, as in this case, the burdens, considered *per se*, are for his benefit, as they leave him the future acquisitions of the debtor without competitors.

This is also true of such creditors, as, having a chance of being preferred, voluntarily reject it.

2. And as to such creditors as accept the assignment, if he may prefer them voluntarily, he may, upon consideration ; at least such preference will stand till they complain. Indeed, the deed as to them, (being parties to it,) is good by the act of Elizabeth itself. The idea of duress therefore can find nothing in the case to attach itself to.

3. The principle, that if a debtor will surrender all of his property to his creditors, they ought to give him a full discharge from his debts, instead of being a principle of fraud and injustice, is one which is born of the purest and noblest feelings of the heart, and which is nurtured and cherished by the most deliberate convictions of the understanding. It is the foundation of all composition with creditors, and of every system of bankruptcy.

*By the Court.*—LUMPKIN, J. delivering the opinion.

Nathan Lichton, an insolvent debtor, executed the following assignment to George M. Dixon and Simon Lichton, to wit:

" GEORGIA,          ⎱    Know all men by these presents, that I,
*Muscogee County*, ⎰ Nathan Lichton, of the County and State
aforesaid, for and in consideration of the sum of five dollars to me
in hand paid by George M. Dixon and Simon Lichton of said
County and State, the receipt whereof I do hereby acknowledge,
have sold and delivered, and by these presents do sell and deliver
in consideration aforesaid as well as in consideration of the trusts
and confidences hereinafter specified to be well and truly per-
formed by the said George M. Dixon and Simon Lichton, the
goods, wares, and merchandise now in store and in possession of
the said Nathan Lichton, in the city of Columbus, Georgia, the
same consisting among other things of brandy, gin, whiskey, rum,
wine, segars, tobacco, cutlery, shoes, razor-strops, bonnets, coffee,
sugar, salt, nails, syrups, bitters, oils, candles, shot, lead, white
lead, powder, wooden-ware, hats, hardware, matches, crockery,
pickles, caps, soap, spices, indigo, London porter, copperas, together
with an assorted stock of dry goods, with many and all other arti-
cles in store as aforesaid.   And in consideration aforesaid, the said
Nathan Lichton hereby assigns and transfers to the said George
M. Dixon and Simon Lichton all the book debts or accounts due
to the said Nathan Lichton, for goods, wares, &c. sold by said
Nathan Lichton.

In trust and confidence that said George M. Dixon and Simon
Lichton shall sell and dispose of the aforesaid stock of goods, wares
and merchandise, to the best advantage, at public or private sale,
for cash, or on such terms as they the said Dixon and Simon Lich-
ton shall think best ; and also shall collect all the book debts due
the said Nathan Lichton, and receipt for the same.   In trust fur-
ther, that the said George M. Dixon and Simon Lichton, shall pay
off and discharge all debts due by said Nathan Lichton for rents,
or to become due on contracts already made, and shall also retain
for their services in peformance of the trusts herein specified,
the sum of five per cent. each, and in addition thereto a sum not
exceeding five hundred dollars for extra time and labour in making
said sales and the settlements herein referred to.   In trust further,
that the said George M. Dixon and Simon Lichton, after having
sold and disposed of said stock of goods, wares and merchandise,
and realized the money therefor, and collected all the book debts
due said Nathan Lichton which can be made available, shall pay
out the same, *pro rata*, to all such creditors hereto annexed, who
shall file their claims in the hands of said George M. Dixon and

Simon Lichton within six months from the date hereof, and who shall release the said Nathan Lichton from all further liability for or on account of said debts.

In testimony whereof, and in acceptance of the trusts herein created, all the parties hereto set their hands and seals, this twenty-fifth day of February, 1847.

NATHAN LICHTON,    (L. s.)
GEO. M. DIXON,    (L. s.)
SIMON LICHTON,    (L. s.)

Signed, sealed and delivered in presence of
    E. HARSNEY.
  WILLIS J. HALSTEAD, J. P."

---

*A List of Debts due by N. Lichton; February,* 1847.

| | | |
|---|---|---:|
| Perkins, Brook & White | New-York | $1,330 85 |
| Lemuel Smith | " .... " | 165 64 |
| Jose Manganedo | " .... " | 668 01 |
| Curtis & Lyman | " .... " | 464 17 |
| W. H. Carey & Co. | " .... " | 527 02 |
| Drury; Fairbanks & Co. | Boston | 757 92 |
| J. & G. C. Alexander | New-York | 507 97 |
| F. J. Conant | " .... " | 705 03 |
| L. Chapman | " .... " | 220 05 |
| Eli C. Blake | " .... " | 121 37 |
| Furman & Davis | " .... " | 295 04 |
| P. Gordon | " .... " | 105 40 |
| Job Chandler & Foster | " .... " | 155 73 |
| Ripley & McCullough | " .... " | 267 70 |
| J. D. Dale | " .... " | 57 00 |
| Ingolsby, Boesseau & Co. | " .... " | 280 16 |
| Cameron, Moore & Co. | " .... " | 350 54 |
| W. D. Smith | " .... " | 31 50 |
| Wm. Underwood & Co. | Boston | 184 99 |
| Smith, Wright & Co. | New-York | 421 31 |
| Cleland & Danforth | " .... " | 103 42 |
| Fanning, Tweedy & Co. | " .... " | 495 35 |
| Samuel Judd's Sons & Co. | " .... " | 444 69 |
| Lawrence Myers & Co. | " .... " | 1707 89 |
| O. & A. Wetmore | " .... " | 1083 32 |
| F. S. & D. Lathrop | " .... " | 160 00 |
| Gans Leverman | Philadelphia | 200 00 |

Ezekiel *vs.* Dixon.

| | | | |
|---|---|---|---|
| Frost & Wallace | New-York | 131 | 50 |
| Thomas & Downing | Columbus | 201 | 80 |
| Jonas Fiedenwald | Baltimore | 80 | 00 |
| Duncan McKenzie | Columbus | 364 | 00 |
| Julius Rettberg | " | 240 | 00 |

Two days thereafter, Emanuel Ezekiel, a creditor not em-braced in the deed, sued out an attachment against Nathan Lichton, upon the ground that he was removing without the limits of the State, which was levied upon the same property conveyed by the deed, it being still in the store formerly occupied by Lichton. The property was claimed by Dixon. Upon the trial of the right of property, the plaintiff in attachment requested the court to charge the jury, that this instrument was void by the act of 1818. This the judge refused to do; but, on the contrary, instructed the jury that, under that statute Lichton had the right to prefer one set of creditors to another, *in this mode,* provided the transaction was *bona fide* and there was no benefit, secret or open, reserved for the benefit of the debtor.

For the giving of this charge, as well as for the refusal to give the instructions prayed for, the plaintiff in attachment excepted. And it becomes our duty to affirm or reverse the decision below.

The act of 1818 is in the following words:- " An act to prevent assignments or transfers of property to a portion of creditors, to the exclusion and injury of the other creditors, of persons who fail in trade, or who are indebted at the time of such assignment or transfer.

" Whereas a practice of selecting particular creditors, by assignments and transfers of property, made by persons indebted, and thereby excluding or defrauding other *bona fide* creditors of their just claims on the estate of insolvent debtors, is contrary to the first principles of equity and justice; to prevent the mischief thereof,

" *Be it enacted, &c.* That any person or persons unable to pay his, her or their debts, who shall at any time hereafter make any assignment or transfer of real or personal property, stock in trade, debts, dues or demands, in trust to any person or persons, in satisfaction or payment of any debt or demand, or in part thereof, for the use and benefit of his, her or their creditor or creditors, or for the use and benefit of any other person or persons, by which

any creditor of the said debtor shall or may be excluded from an equal share or portion of the estate so assigned or transferred, such assignment, transfer, deed or conveyance, shall be null and void, and considered in law and equity as fraudulent against credditors. *Provided nevertheless,* That nothing contained in this act, shall prevent any person or persons in debt from *bona fide* and absolutely selling and disposing of any part or the whole of his, her or their estate, so the same be free from any trust for the benefit of the seller, or any person or persons appointed by him, her or them." *Prince,* 165.

Counsel for the assignee admit that the deed to Dixon is within the words of the act of 1818; but they contend, that it shall be adjudged to be without its operation, because it comes within the reason of the *proviso,* which allows a preference to be made in a particular way, by an insolvent debtor among his creditors.

[1.] There are two modes of construing statutes—the one *strict,* the other *liberal.* The *former* adheres to the plain and obvious meaning of the law as it is written. The *latter* takes a larger, wider, and more comprehensive survey. It distinguishes between the intent and the natural signification of the words employed by the legislature; and declares, that a case, not within the meaning of the statute, *according to the opinion of the judges,* shall not be embraced in the operation of the statute, *although clearly within the words.* And, *vice versa,* that a case within the meaning, though not within the words, shall be included. Nay, it goes still further, it seats the court in the senate chamber, and authorizes the judge to give such construction as will not only carry out the mind of the makers, but even to apply the rule to cases which, it is admitted, they did not contemplate, but which, it is supposed, the lawgiver would have provided for, if he had seen fully the mischief and the remedy. Sitting in an American court, I never can subscribe to this doctrine, and give my sanction to the latitude in which it has been practically indulged in its application in England.

Where British statutes, such as the statute of frauds, of limitations, and the *habeas corpus* acts, have been adopted by our own legislation, it is reasonable to suppose, that it was designed to receive and incorporate, as well the known and settled construction which had been given by the British courts to these acts, as the acts themselves. In such cases, therefore, we are not at

Ezekiel *vs.* Dixon.

liberty to controvert the constitution; but, when called upon to interpret an act of our own, we are fettered by no such shackles.

Moreover, great regard ought to be paid to the interpretation put upon a statute by the sages of the law who presided at the time, or shortly after its passage; *cotemporanea expositio est fortissima in lege.* It becomes a rule of conduct for our people, contracts are regulated by it, large and valuable estates depend upon it; and although, if it were now *res integra,* it might be very difficult to maintain such a construction, yet, at so late a day, the *argumentum ab inconvenienti,* applies with great weight. We ought not to disturb a principle that has so long and so extensively prevailed; *communis error facit jus.*

I acted upon this principle in *Whitehead* vs. *Peck,* 1 *Kelly* 140, and likewise in *Booth* vs. *Williams,* 2 *Kelly,* and have since regretted that the Court had not yielded to it, in *Harrison et al.* vs. *Walker,* 1 *Kelly,* 32, although I have never doubted, in other respects, the correctness of that decision.

Excessive legislation is said to be the vice of republics; yet, after all, it may be proof only of the entire separation of the *judicial* from the *legislative* department of the government. Each moves in its own orbit, and discharges the functions peculiar to itself. What jurist has not felt surprised at finding how very few acts of parliament existed, which had any relation to the general principles of the English law; these have been left to be moulded, almost exclusively, by the courts of justice. Most of their statutes relate to mere fiscal regulations and concerns. British judges have not hesitated to assume legislative power, and, under the pretence of judicial exposition, have, in fact, made a great portion of the law of England. Lord Mansfield presided in the King's Bench from 1756 to 1788, thirty-two years. During this period there were decided some forty cases on insurance, a half dozen under the title of factors and agents, and a dozen or more on bills of exchange and promissory notes; and it is impossible to *read* many of these opinions, as reported in *Burrow, Cowper, Douglass,* and the 1st volume of *Term Reports,* and discriminate between them and the statutes of the legislature of the realm for the same epoch.

It was the boast of Chief Justice Pemberton, that, while he was judge, he had made more law than kings, lords and commons, since the time he was born.

I admit, that whenever the words of an act are obscure or

doubtful, or bear either none or a very obscure signification, the intention of the legislature, as well as other helps, may be resorted to in order to find and fix their true meaning. But I hold, at the same time, with Lord Chief Justice Willes, "that it is very dangerous for judges to launch out too far in searching into the intent of the legislature, where they have expressed themselves in plain and clear words. *Willes*, 397.

And, with the Supreme Court of the United States, in *Sturges* vs. *Crowninshield*, " that, although the spirit of an instrument, especially of a constitution, is to be respected not less than its letter, yet the spirit is to be collected chiefly from its words." And that, " it would be dangerous in the extreme to infer, from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation. Where words conflict with each other, where the different clauses, of an instrument bear upon each other, and would be inconsistent, unless the natural and common import of words be varied, construction becomes necessary, and a departure from the obvious meaning of words is justifiable. But if, in any case, the plain meaning of a provision, not contradicted by any other provision in the same instrument, is to be disregarded because we believe the framers of that instrument could not intend what they say, *it must be one in which the absurdity and injustice of applying the provisions to the case would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application.*" 4 *Wheaton,* 202. The Marquis Beccaria, in his admirable little treatise on Crimes, thus expresses himself: " There is nothing more dangerous than the common axiom—the *spirit* of the laws is to be considered. To adopt it, is to give way to the torrent of opinions. Our knowledge is in proportion to the number of our ideas ; the more complex these are, the greater is the variety of positions in which any proposition may be considered. Every man hath his own particular point of view, and, at different times, sees the same objects in very different lights. The *spirit* of the laws will then be the result of the good or bad logic of the judge ; and this will depend on his good or bad digestion, on the violence of his passions, and on all those little circumstances which change the appearance of objects in the fluctuating mind of man.

" The disorders that may arise from a rigorous observance of the letter of the laws, are not to be compared with those produced by the interpretation of them. The first are temporary inconveniences, which will oblige the legislature to correct the letter of

the law; and this will put a stop to the fatal liberty of explaining. When the code of laws is once fixed, it should be observed in the literal sense; and nothing more is left to the judge, than to determine whether an action be or be not conformable to the written law.   When the rule of right, which ought to direct the actions of the philosopher as well as the ignorant, is a matter of controversy, not of fact, the people are slaves to the magistrates."

Shall truths like these bring upon their author the classical reproach, *qui haeret in litera, haeret in cortice?*   They are far too enlightened for the soil (Milan) which gave birth to them.   They would confer honour even on the conscript fathers of our own republic.   The most stern and stubborn devotee to liberty and limited government, never gave utterance to sounder or more salutary sentiments.

Mr. Bisset, author of the Life of Burke, and of the History of the reign of George III., makes the following admirable and appropriate reflections in referring to the retirement of Lord Mansfield from the King's Bench.

" For comprehending the law of this particular country, William Murray, a man of the most acute and extensive genius, had prepared himself by a profound study of history, general ethics, the philosophy of jurisprudence, the investigation of human passions and conduct, and the civil law, on which the judicial institutions of so great a part of modern Europe are founded.   On this basis he raised his superstructure of knowledge of the English code.   To the depths of legal science, the accuracy and extent of juridical details, he added the pleasing and impressive accomplishments of an engaging, graceful and persuasive eloquence.   From such an union and extent of qualifications, Mr. Murray very early rose to most distinguished practice.   With such opportunities of observing the circumstances of society, of civil 'actions and engagements, and criminal perpetrations, his penetrating and comprehensive mind saw that the progress of social, and especially commercial intercourse, was producing new combinations, which had not been specially foreseen when the laws applied to such subjects were enacted ; therefore he inferred that the essential principles of justice *required such a latitude of interpretation as would render existing laws applicable to the new cases.*

" The intelligent reader must know that there are two great standards of judicial interpretation; the one the authority of custom, decision and statute, according to the literal definition ;

the other according to the general principles of equity construing particular law, written or unwritten, in such a way as best to answer the great ends of justice.   The learned reader must recollect that, at Rome, two sects of civilians arose from the above-mentioned difference, the Proculians and the Sabinians, taking their names from two eminent jurists.   The first of these, resting entirely on authority and definition, merely considered the letter of the law.   The second, interpreting more freely, endeavoured to adapt it to their conceptions of justice in the case.   Each of these modes has advantages and disadvantages; by the former, parties may know the exact rule by which their dispute will be tried, but may find the literal judge difficulted in applying his rule to their case, or entangled by precedents, forms and definitions, unable to solve the question agreeably to substantial justice ; by the latter, the parties may, from a just and competent judge, expect an equitable determination of the question : *but they depend on his individual understanding and integrity.*   By deviating from literal explanation, in the progress of construction *the law may be changed, and thus the judge become a legislator.*   During the republican periods of the Roman law, strict and rigid interpretation of usages and decrees prevailed; during its imperial history, latitude of construction was gradually substituted, and when Trebonian and his associate civilians digested the laws into one great body under Justinian, its constructive character predominated ; hence modern jurists, whose legal doctrines have owed a great part of their formation to the civil law, have interpreted freely.

  " The close precision of English reasoning has diffused itself through municipal institutions, and, combining with the English accurate sense of justice, has in the great body of the law made so specific provisions for all cases, when the laws were enacted likely to occur, *that it may be safely advanced as a general position, that in every question within the knowledge, foresight and intent of our law-givers, the more nearly the decision follows the letter of the law, the more fully will the purposes of justice be answered ;* but when combinations of engagements and conduct arise, which law-givers have not specifically anticipated, and on which the judge is called to give decision, he must apply the constructive character of the civil law."

  The Historian and Reviewer, after noticing the fact that his great favourite verged more to constructive than literal interpretation, " partly from that powerful and comprehensive genius,

which, in seeking its ends, might less regard customary details than adequacy of means," thus concludes : " Perhaps on the whole, unless a judge be uncommonly sagacious and able, literal inter- pretation, keeping as closely as possible to precedent and statute, if in some cases it may be an obstacle to what is right, yet in a. much greater variety, is a preventive of what is wrong."

Who does not see in this picture the shadowy outline of the two. great political parties which divided this country at the formation of the Government ? Instead of taking the constitution (our· supreme law,) as it is, and adhering to it in good faith, the friends. of consolidation *have sought by interpretation* to make it what they would have it to be. And this was threatened in the convention. that formed it, if the annals of the times are to be credited. Had. latitudinary interpretation—the ever-fruitful source of disputation and strife—been eschewed from the beginning, we should, as a nation, have escaped those heart-burnings and contentions which have repeatedly menaced the overthrow of our beloved Union.

With these general observations as lights to 'our path, what, I ask, is the plain reading of the act of 1818, as heretofore quoted ? And, to collect its meaning, let us look to the law itself, leaving out of view *title, preamble and proviso.* I would remark, however,, that the *title* is in strict conformity to the enacting clause. That. the preamble cannot of course restrain the body of the act. (2 *Har. & Johns.* 69.) The difficulty here is, that the preamble is *larger* than the act itself; and as to the proviso, it does not affect, in the remotest manner, the body of the act. And besides, it confers no new right. There never was a time when an insolvent person might not *bona fide* and absolutely sell and dispose of his property, provided it was free from any trust.

I recur then to the question, what is the intent of this act ? [2.] It speaks for itself, and in the most clear and unambiguous lan- guage. It declares that any person unable to pay his debts, who shall make an assignment of his property in trust to another, in satisfaction of any debt, or in part payment thereof, for the use and benefit of his creditors or any other person, by which any creditor of the debtor shall be excluded from an equal share or portion of the estate so assigned, such conveyance shall be void as against the creditor or creditors so excluded.

Is not, I ask, the transfer from Lichton to Dixon & Lichton [3.] the Daguerreotype likeness of the one prohibited by the act ? Nathan Lichton, admitted to be insolvent, assigns the whole of his

Ezekiel *vs.* Dixon.

effects to George M. Dixon and Simon Lichton, in trust—first to pay them for their trouble, and then in payment of certain creditors, provided they will file their release in a given time ; and this is done to the exclusion of Emanuel Ezekiel, the plaintiff in attachment.   To sustain this instrument is to repeal the statute.   If this deed is not condemned by it, nothing can be.   It is drawn in the very teeth of the act; and what is there out of the body of the statute to help it ?

The title of the act is to prevent *partial* assignments.   The preamble asserts, that any preference given to particular creditors by insolvents, is unjust ; and the act then proceeds to designate a particular mode in which this shall not be done—no doubt the mischief which the Assembly had in its eye at the time.   It then concludes by declaring, that notwithstanding this class of conveyances was prohibited, that it was not their design to prevent any person from making a *bona fide* and absolute sale of his property.   And because a preference might still be made in this way, by selling the property either to the creditor himself, or to a third person, and paying over to the favoured creditor the proceeds in extinguishment of his demand, it is gravely insisted that it was unreasonable to forbid a preference being made in the way now attempted. This may be true ; still, had they not the right thus to discriminate with or without reason—yea, even *against* reason ?   And are not courts powerless to interfere ?   And yet I feel it due to the authors of this act, to say, that I can see many reasons why a direct 'sale would be tolerated, and this species of conveyance to relatives and friends in trust for creditors, repudiated.

But I am content to shield myself under the obvious import of the terms of the statute itself.   I shall always deem it my duty to conform to the express will of the Legislature when the statute is constitutional, reasonable, effectual, and free from obscurity.   And when the language, as in this instance, is clear, direct, and positive, leading to no absurd results but affording a suitable if not a sufficient remedy to an existing evil, I do not feel at liberty to speculate upon the imperfection of the law as it is.   I repeat it, for it is a vital truth, and one which cannot be too often reiterated, that there is nothing more fatal to the security of person and property, than the uncertainty which must necessarily attend that law which looks to the Bench for its *occult* meaning.   No citizen, no attorney, ever can calculate exactly in such a contingency.   Hence the discontent always evinced at this method of interpreting laws.

In the one mode the whole profession harmonize. In the other there is not, and, from the nature of the case, never can be, either uniformity or stability.

Judgment reversed.