Weldon, J.,
delivered the opinion of the court:
This is a proceeding under the act entitled “An act to provide for the adjudication and payment of claims arising from Indian depredations” (1 Sup. B. S., 2ded.,p. 913). Claimants allege that in* the year 1878, they were the owners of a large amount of property, to wit, 29 head of horses and colts, and 400 head of stock cattle in Happy Yalley, in the county of Grant, now Malheur County, State of Oregon; that the Piute and Bannock Indians, then in amity with the United States, took and destroyed said property without just cause or provocation on the part of the owners; and that the claim was presented to the honorable the Commissioner of Indian Affairs; but was not paid or any part thereof.
The findings show, that in the month of June, 1878, the claimants were possessed of a ranch in said county and State, on which they had at the time horses and cattle; that, at that time the Bannock and Piute Indians made a raid in and through said county and upon the ranch of claimants; that in the raid through said county the Indians destroyed property consisting of horses, cattle, and dwellings; that the Indians at the time of the raid numbered between 500 and 600, and were in a body or band moving in concert, having the form of an Indian military organization. In said raid the Indians took and destroyed cattle and horses of the claimants amount *167 ing to tbe sum of $5,450, and no part of tbe property included in said amount was returned or paid for; tbat tbe claim was presented to the Commissioner as alleged and tbe destruction was without provocation on tbe part of tbe claimants or their agent in charge of tbe property at tbe time.
Tbe first clause of tbe act upon which tbe jurisdiction of this court is dependent is as follows:
“First. All claims for property of citizens of tbe United States taken or destroyed by Indians belonging to any band, tribe, or nation in amity with tbe United States, without just cause or provocation on tbe part of tbe owner or agent in charge, and not returned or paid for.
“Second. Such jurisdiction shall also extend to all cases which have been examined and allowed by tbe Interior Department.
“And also to such cases as were authorized to be examined under tbe act of Congress making appropriations for tbe current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for tbe year ending June thirtieth, eighteen hundred and eighty-six, and for other purposes, approved March third, eighteen hundred and eighty-five, and under subsequent acts, subject however to the limitations hereinafter provided.”
The first question to be determined is, has the court jurisdiction of the cause? the raid having incident to it many of the characteristics of an Indian war.
It is contended on the part of some of the counsel in like cases that it is wholly immaterial as to what was the condition of the Indians at the timé of the alleged depredations, and the fact that they were in a state of hostility against the United States does not deprive the court of jurisdiction. On the part of others it is conceded that amity is essential in some cases; but though there be a state of hostility and yet treaty relations existing between the United States and the Indians, the fact of such treaty will justify the court in assuming jurisdiction of a cause and awarding damages because of the depredation. It is contended on the part of the defendants that if a state of hostility existed in fact, that such condition is sufficient to bar the jurisdiction of the court, and that the fact of treaty relations will not justify the court in assuming jurisdiction.
This is the first case, tried and decided upon its merits, litigated in this court. The judgments which have been ren *168 ■dered were upon the second clause of the statute giving jurisdiction-to render judgment in all cases which have been allowed by the Interior Department} and which neither party desires to litigate.
The findings show that a state of amity did not in fact exist between the United -States and the Indians alleged to have committed the depredation; but it is insisted that under the second division of the second clause of the first section of the act that we have jurisdiction to determine the controversy on its -merits, and give such damages as from the evidence it is shown the parties have suffered. The word amity, as used in the first clause of the first section, is the subject of serious dispute and contention between the counsel.
In the construction of a statute words are to be taken in their ordinary and common acceptation, unless such a construction will do manifest violence to- the intention aDd purpose of the legislature. The word amity is not technical in its character, is not peculiar to a circumscribed subject-matter, and must be construed by the court in its broad and ordinary signification.
The Century Dictionary defines the word as follows: •
“Friendship in a general sense, harmony, good understanding, especially between nations; political friendship, as a treaty of amity and commerce. * * *
“These appearances and sounds, which imply amity or enmity in those around, become symbolic of happiness and misery. H. Spencer, Prin. of Psychol.
“Synonym. — Friendliness, kindliness, good will, affection, harmony.”
The court,' taking the word in its ordinary and common signification, must conclude that it intends to indicate a state of peace and good fellowship between the Indians upon the one side and the United States upon the other, and if such a state does not exist, then under that clause of the statute, no jurisdiction is incident to or inherent in the court.
The Supreme Court of the United States, in the' construction of an amendment to a railroad charter, said:
“But Yattel’s first general maxim of interpretation is, that “It is'not allowable to interpret what has no need of interpretation,” and he continues: “When a deed'is worded in clear and precise terms — when its meaning is evident and leads to no absurd conclusions — there can be no reason for refusing to *169 admit the meaning which such deed naturally presents. To go elsewhere in search of conjectures, in order to restrict or extend it, is but to elude it.” Vattel’s Law of Nations, 244. Here the words are plain and interpret themselves. (Ruggles v. Ill., 108 U. S., 534.)
“But all these rules are understood to be subject to the qualification that, where the language is free from ambiguity, leads to no absurdity, and hence needs no interpretation, nothing beyond it can be regarded. (Bndlich, Interpretation of Statutes, sec. 27. Ezekiel v. Dixon, 3 Ga., 146.)”
The findings set'forth at length the'dispatches and communications of different Army officers having in charge the maintenance of peacable and friendly relations with the Indians, which show that during the summer of 1878 those relations were disturbed to the extent of open hostilities between the United States, the Bannock and Piute tribes. On October 24, 1878, the major-general commanding the division and department in which the Bannock tribe was located writes the Adjutant-General at Washington, “I also send copies of all the telegrams and orders issued in relation to the hostilities commenced at Big Canon Prairie, Idaho, last May, and which spread all over Idaho, Nevada, and Oregon, commencing with the Bannocks, involving the Piutes, Snakes, and affecting the river tribes to the south of the Columbia Biver, and causing great anxiety and fear the trouble might have extended to the larger tribes north of the Columbia. # * * The campaign lasted till late in the summer, was a very fatiguing one, caused much loss to life and property to the inhabitants, the troops, and the Indians.” The inhabitants of the district of country in which it is alleged the depredations were committed petitioned the Government for protection against the warlike act of the Indians. Those dispatches and reports, in connection with the action of the War Department, clearly demonstrate the want of amity, and establish the condition of actual war so far as that condition can exist between a small tribe of Indians and the United States.
This court has had occasion to determine as to wbat constitutes a condition of war between the United States and an Indian tribe. In the case of Alire v. United, States (1 C. Cls. R., 238) it is said:
“ Though there may have been no formal declaration of war by Congress, nor any public oficial proclamation of its exis *170 tence by tbe President of tbe United States, yet it can scarcely be doubted, from tbe official acts and recognitions by tbe President and by Congress of tbe existing hostility by these tribes, and tbe means taken to suppress the disturbance and chastise them into submission, there existed that condition of things between the Government of the United States and those tribes known, in common parlance as well as legal enactments, as an 1 Indian war.7 In our intercourse and dealings, with these savage tribes, regarded in our laws as independent and domestic nations, we do not apply the same rules of peace or war that regulate the intercourse and fix the relations between us and foreign independent nations. Though we have had many ‘ Indian wars,7 it has been but rarely that Congress, in which the Constitution vests the right to declare war and make peace, has enacted or resolved a formal declaration of hostilities against any tribe or tribes. It has been regarded as sufficient that they have by law provided for the protection of our frontier against the attacks of these tribes, and for calling out volunteers to aid the Army, leaving the executive department to act according to the emergencies as they arise. And Congress has seldom failed to recognize and ratify such acts by voting appropriations to pay the troops called out and defray the expenses incident to such expeditions. This case has been no exception to the general rule. And taking into view the actual condition of things in the Territory of Hew Mexico between the 1st of January, 1855, and the 1st of August, of the same year, with the acts of this Government during that period and subsequently, we can not say that this was not an ‘ Indian war.7 There were repeated acts of depredation by the Indians upon the property of the white settlers, many acts of cruelty, murder, and massacre, such as are incident to savage warfare. These were repelled and punished by the forces of the United States under a general officer in command of the department. Voluhteers in aid Of these forces were called out upon requisitions made upon the civil governor of the Territory, and these were duly organized and mustered into the service of the United States. Expeditions were planned against these Indians, their country invaded, and battles fought against them, and finally a treaty of peace concluded with them.77
In the troubles with the Bannock Indians in the year 1878 all the substantial elements existed except the formal treaty of peace that existed between the United States and the Indians in the troubles in the Territory of New Mexico in the year 1885, which were held to constitute a state of “Indian War77 within the meaning of the law in the Alire case.
In the case at bar treaty relations did exist between the Bannocks and the United States, and one of the questioñs for *171 us to determine is, whether the fact of such relation dispenses with the condition of amity as prescribed by the first clause of the section. The court is of the opinion that treaty relations are no equivalent in law to amity, .and do not relieve a claimant from proving a state of amity in cases coming within the first clause of the first section of the statute. The statute to which the second clause of the second division of the section is applicable is the Act of March 3, 1885 (23 Stat. L., 376), and is as follows:
“ Indian depredation claims. For the investigation of certain Indian depredation claims, ten thousand dollars and in expending said sum the Secretary of the Interior shall cause a complete list of
“ All claims heretofore filed in the Interior Department and which have been approved in whole or in part and now remain unpaid,
“And also all such claims as are pending but not yet examined, on behalf of citizens of the United States on account of depredations committed, chargeable against any tribe of Indians by reason of any treaty between such tribe and the United States,
“Including the name and address of the claimants, the date of the alleged depredations, by what tribe committed, the date of examination and approval, with a reference to the date' and clause of the treaty creating the obligation for payment, to be made and presented to Congress at its next regular session;
“And the Secretary is authorized and empowered, before making such report, to cause such additional investigation to .be made and snch further testimony to be taken as he may deem necessary to enable him to determine the kind and value of all property damaged or destroyed by reason of the depredations aforesaid, and by what tribe such depredations were committed; and his report shall include his determination upon each claim, together with tbe names and residences of witnesses and the testimony of each, and also what funds are now existing or to be derived by reason of treaty or other obligation out of which the same should be paid.”
The only treaties made between the United States and the Bannock tribe of Indians are the treaties of July 3 1868 (15 Stat. L., 673), and the one bearing date May 14,1886 (Laws U. S. relating to Indian Affairs, 1884, p. 339). It is not necessary to refer to the last named treaty, as its provisions can have no possible bearing on the question at issue in this case. It relates to a grant to the Lemhi Indians to locate upon a reservation in Idaho belonging to the Shoshones, Bannocks, and *172 Sheepeaters of Idaho. . The only treaty which we are called upon to construe is the one of July 3, 1868.
Among other provisions is the following:
“If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, on proof made to their agent and notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws; and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due orto become due to them under this or other treaties made with the United States. And the President, on advising with the Commissioner of Indian Affairs, shall prescribe such rules and regulations for ascertaining damages under the provisions of this-article as in his judgment may be proper. But no such damages shall be adjusted and paid until thoroughly examined and passed upon by the Commissioner of Indian Affairs, and no one sustaining loss while violating or because of his violating the provisions of this treaty or the laws of the United States shall be reimbursed therefor.”
The act of 1885 made an appropriation of $10,000 for the investigation of Indian depredation claims and the subsequent acts making appropriations for the same purpose do not differ essentially from the act of 1885.
For the purpose of facilitating Such investigation the Secretary of the Interior is directed to complete a list of all claims “which have been approved in whole or in part and now remain unpaid and also such claims as are pending, but not yet examined, on behalf of citizens of the United States on account of depredations committed chargeable against any tribe of Indians by reason of any treaty between such tribe and the United States.” Without at present determining the full force of the act of 1885, in the enlargement of our jurisdiction, in cases where amity does not in fact exist, it is sufficient for the purposes of this opinion to state that the claim made in this case does not come within the requirements of the act of March 3,1885, in belonging to the class of claims required to be-listed by the Secretary of the Interior for the direction and control of the investigation contemplated by that act.
The treaty between the United States and the Bannock Indians provided a mode of procedure upon the part of claimants which would make the Indians responsible by a loss from *173 tbeir annuities 5 but that condition does not exist in tbis case. The depredation complained of in this proceeding was not the subject of investigation before the Indian agent, for the purpose of bringing the claim within that provision of the treaty making the tribe responsible by a diminution of annuities, because of a failure to deliver for punishment a wrongdoer.
Upon the whole case, it is the conclusion of the court that the facts found do not bring the case within the jurisdiction of the court authorizing a judgment for the claimants for the amount which they have suffered in consequence of the wrongs inflicted on them by acts of the Indians, and the petition is, therefore, dismissed.