Weldon, J.,
delivered the opinion of the court:
The amended petition, filed by leave of the court on the 13th of February, 1897, is iu the name of Kobert Painter, for himself and as administrator of Herman Painter, deceased.
The findings show that the plaintiff and the decedent were the joint owners of the property destroyed in the county of Humboldt, State of California, by the defendant Indians. .The *128 case is contested on two grounds: First, that the evidence is not sufficient to establish the ownership of the property and the identity of the Indians; and, second, that at the time of the alleged depredations the defendant Indians were not in a state of amity.
We have found that the Indians committed the depredations, and that the property was worth more than $3,000. While the identity of the Indians may be in some doubt, we consider that a preponderance of the evidence shows that the depredations were committed by the alleged Indians, and that the reasonable value of the property was more than $3,000.
The plaintiff and the decedent at the time ol the deqireda-tions were citizens of the United States, having been born in the State of Ohio, from which they emigrated to California several years before the time of the first depredation. The only question, to be considered is the question of amity, upon which the defendants have placed their principal reliance in defending themselves against liability.
The property destroyed consisted of dwellings, outhouses, oxen, horses, cows, and stock cattle. Most-of the cattle were destroyed by being driven from a precipice into the river; the horses were killed and the houses burned after the claimant and his family had been driven by the Indians some distance to a settlement, where two men were killed by the Indians. The findings show that it was a wanton destruction of property and not a theft for the purpose of deriving a benefit from the possession and use of the property. By reference to the map it will be seen that the county of Humbolt is situated in the western part of the State, and for many miles is bounded on the west by the ocean; that it abounds with streams, mountains, and valleys, affording a safe retreat for Indians in carrying on a war for the purpose of preventing the country from becoming a peaceful and permanent home for white settlers. The findings upon the question of amity show that the Indians were actuated by a common purpose of hostility in attempting to prevent the settlement of white men and the successful establishment of an Indian reservation. While many persons were killed by the Indians during the period embraced within the limits of these depredations, and while the State and National troops killed many of the Indians, the policy of the Indians was not to fight, but the destruction of property and the desolation of settlements. As to the inception and cause of the *129 troubles in the Humboldt district, Captain Porter, of the United States Army and acting Indian agent, says, “How or why the Indian depredations originated is of no consequence in this connection. Most probably the causes of the outbreak were merely a repetition of the old story of Indian history. From small isolated raids the troubles increased until the country became the scene of widespread hostility.” The condition from which the court has deduced the legal conclusion that the Indians were not in a state of amity commenced in the year 1859, before the date of the first depredation, and continued long after M arch, 18C2, the time of the last raid, when the home and houses of the plaintiff were destroyed, which resulted in the necessity of an abandonment of the settlement.
The circumstances of the depredations indicate that they were not perpetrated for the purpose of gain, but as the result of the malevolence and hostility of Indians toward the white settlers of that portion of the State of California.
Mr. Wiley, former superintendent of Indian affairs for California, in speaking of the condition and character of the Indians inhabiting what is known as the Humboldt district, says: “It is extremely difficult to convey an idea of the social divisions that exist among these strange beings. Unlike tribes of the Bast, they are divided into small bands, who build rude houses on the banks of some river or mountain creek and seem to live within themselves almost a separate people.
d The name of a river or stream was generally adopted to designate the Indians without any distinct tribal organization, but having a head or leader of sufficient authority to form a band, each band speaking a language peculiar to itself.”
It is said by the same authority that as early as 1856 the Indians on Redwood Creek, Crouse Creek, and the head waters of Eel River commenced a war which before its close resulted in the loss of many valuable lives, the destruction of an immense amount of property, and the killing of a large number of Indians.
In 1858, in consequence of the disturbance and troubles, Governor Weller, in answer to frequent petitions from the people for protection, called into the service of the State a company of volunteers to serve for three months, the result of which was that a large number of Indians were taken prisoners and placed on the Mendocino Reservation against *130 the protestations of the people of Humboldt County. They remained but a short time; nearly all of them found their way back to their old haunts more embittered and hostile than they were before their capture. Many white persons were killed, and, as the superintendent said in his report, the Indians “seemed bent on the extermination of all the settlers, killing- their best friends as soon as their worst enemies.” In 1861 General Wright sent a regiment of troops to the Humboldt military district and the citizens were led to hope that the war would be brought to a close. Speaking of the campaign of Captain Lippitt, the report characterizes it as a failure.' “Quite a number of prisoners were taken in the Eel River country, and in all a considerable number of Indians were killed, but the extent and daring of hostilities increased rather than diminished. Men were murdered and houses burned under the very eyes of the troops, and the citizens of such towns as Areata were shot down in daylight while pursuing their customary avocation.”
After more than a year the regiment was relieved and a battalion of mountaineers of six companies raised in the counties suffering from the war and placed under the command of Colonel Whipple. The Hoopa Indians about this time took the field and participated in the hostilities which ensued. All the settlers of the mountains were driven in, and their improvements burned. In January, 1863, the grand jury of Kla-math County, in recognition of the condition of the country, said, in substance, in their report, that that portion of Klamath County bordering on Humboldt County had become entirely deserted, that the improvements of the citizens had been burned and many valuable lives lost by the brutal savages who infest that section, and recommended that the authorities make another effort with the Government to call into service a sufficient force to expel forever the hostile Indians from that part of the two counties.
In February and March, 1861, Captain Lovell and Lieutenant Flynn say “the Indians have no principal man exercising any control. * * * They avoid combat and run on all occasions.” They were unable to find any Indians at that time. The' extracts from the Rebellion Record, as set forth in the findings, indicate that the main purpose was to remove the Indians to the reservation with as little bloodshed and trouble as possible, the removal being for the sake of the Indians and *131 whites, and that the condition was as much due to the fault of the white man as the Indian; but it is wholly immaterial from what cause the condition arose, if it was a state of hostility and a want of peace. While it is said that it was not the purpose of the military “ to make war on the Indians,” but to bring them onto the reservation, the execution of that policy destroyed the condition of amity and peace.
It is not necessary to refer further to the condition of the Indians as shown in the findings, except to quote the material portions of the letter of Major-G-eneral McDowell, who was in charge of the military district of California during a portion of the time when the most serious trouble existed in the Humboldt district, and to the letter of the Commissioner of Indian Affairs, dated August 2,1861.
The letter of Maj. Cen. Irwin McDowell in its material parts is as follows:
“ SAN FRANCISCO, August 17,1864.
“ In the expeditions made after hostile Indians many are taken prisoners, and, as is the case in the Humboldt district, several hundred have to be fed from the military supplies. * * * The Indian Department decide that they can not feed Indians who are prisoners in the hands of the military; that the military have always fed their own prisoners; * * * that if Indians are turned over to them at their reservations they will be provided for. * * * We have now several hundred Indians in our custody. Some were brought in; some came in and surrendered. * * * We have been obliged to feed them till the Indian Department receives them. To refuse to do so would drive them to the necessity of committing fresh depredations, and thus reopen the war.”
The letter of the Commissioner in its material parts is as follows:
.“ The hostile Indians, with whom we have been so long at war, live principally in Hoopa Valley. The warriors, some 75 in number, are now there, with arms still in their hands, waiting to see what is to be done. Hoopa Valley is about 5 miles in length and 2 in width, with Trinity Biver in the center. * * # i regret that the statements of the former superintending agents should induce you to think that these hostile Indians could, either by being subdued or by treaty, be kept on any of the northern reservations. * * * The treaty of which you speak, with the Indians of northern California and northern Oregon; * * * can not possibly have any effect upon the military operations now in pi ogress in the Humboldt district. The Klamath Lake and Modoc Indians are distant several hundred miles from the Indians in this district, and *132 are as entire strangers to each other as the Cherokees and Flatheads.”
Superintendent Wiley, on August 29, 1864, writes to the Commissioner of Indian Affairs as follows:
“ On the 2d ultimo I informed you that I would start for the north for the purpose of making some kind of a settlement with the hostile Indians in the Humboldt district. The headquarters for the Indians who have been engaged in the war in that portion of the State for five years past is Hoopa Talley, on the Trinity River. I arrived there on the 10th ultimo, and found most of the hostile Indians in the valley with their guns still in their hands, awaiting my arrival.”
The consternation and alarm in the public mind during a portion of the time covered by the troubles from which the many depredations complained of in the different causes pending in the court arose may be realized from what is said by Superintendent Wiley, who says:
“The vast herds of stock that ranged on the fine grazing land back from the coast were swept away; * * * The mail carrier on the route to Weaverville was killed, and also the postmaster at Albeville. Travel was entirely stopped, except at night or under guard of a heavy escort.”
“The business interest of the country was well-nigh destroyed and gloom supplanted the peace and prosperity that had previously rendered that district among the most attractive in the State.”
The findings show many other facts founded on the official history of the times, tending to prove a state of chronic and determined hostility between the Indians and the inhabitants of Humboldt and adjoining counties. While the military, both State and Federal, had many conflicts with the different bauds of Indians and took many of them prisoners, it does not appear that any engagements took place between them having the proportions of what might be called a battle.
In reporting the campaign of Captain Messic, who commanded the troops called into service by Governor Weller, Superintendent Wiley says: “They gained but little advantage over the Indians, as the natives resorted to their usual modes of warfare- — waylay, shoot, and run.”
The findings have many other extracts from public documents tending to show the condition of the Indian tribes who are defendants in this proceeding, and the relations existing between them and the inhabitants of Humboldt and the adjacent counties; but it is not necessary to refer to them further *133 in detail. The whole record tends to establish a determined state of hostility on the part of the Indians toward the inhabitants and a settled purpose on the part of the Indians to prevent the appropriation of the country by the settlement of the white man. There was an absolute want of peace, friendship, and amity between the parties. It is true, as has been said, that no engagements were fought amounting in their importance to the dignity of battles, but there was a continued state of epidemic hostility. Whenever the parties met it was a signal for bloodshed, which could only be avoided by the successful flight of the Indian or the white man. Applying the rules of law as they have been established by the Supreme and this court on the question of amity the result in this case is relieved from doubt and perplexity. “ Tribes, bands, or nations who raid on their neighbors, wage war upon them, and commit depredations can not be held to be in amity with the country whose citizens are thus injured.” ( Valid s Case, 29 C. Cls. R., 62.)
Amity means “ a state of peace and good-fellowship between the Indians upon the one side and the United States upon the other, and if such a state does not exist,” the court is without jurisdiction.. (Marks's Case, 28 C. Cls. R., 147.) The amity required by the act of 1891 is that of the band, tribe, or nation, and it means not treaty relations but a condition of peace and friendship. (Leighton's Case, 29 C. Cls. R., 288, syllabus.) In the same case the Supreme Court say, “It is true, counsel suggest that the Indians were carrying on hostilities for only a special purpose, to wit, resisting the opening of a military road. We fail to appreciate the argument that because hostilities were carried on for only a single purpose, and not for the mere sake of fighting generally, the tribe engaged in such hostilities was nevertheless still in amity.” (161 U. S. R., 295.) In the case of Marks (161 U. S. R., 301) the Supreme Court, in discussing the questions of peace and war as they are affected by principles of international law in contests between independent nations, says: “Without questioning these declarations and decisions as applied to the relations between independent nations, we think they avail but little in the solution of the question here presented. That question is, what limitation did Congress intend by the words ‘in amity with the United States.’ The word ‘ amity’ is not a technical term. It is a word of common use, and such words when found in a statute must be given their ordinary meaning unless there be *134 something in the context which compels a narrower or a different scope. Webster defines it ‘friendship, in a general sense, between individuals, societies, or nations; harmony; good understanding, as a treaty of amity and commerce.’ The last part of this definition shows that the phrase ‘in amity’ is not equivalent of ‘under treaty.’ A ‘treaty’ implies political relations; ‘amity’ signifies friendship, actual peace.”
The relations between the Indians and the inhabitants of the district of the country in which the depredations were committed were deficient in all the elements of friendship, peace, and harmony, so that whatever violence or injury was committed on either side resulted from the spirit of hostility, hatred, and ill will, and not from the ordinary motives which actuate persons in the commission of wrong for the purpose of gain and profit.
The mental and moral condition on both sides was that of hostility, and from that condition originated the purpose which actuated the defendants in doing what they did in the destruction of claimants’ property. Underlying the purpose of the Indians was the general policy of resistance to the encroachment of the whites and the maintenance of their right to go where they pleased in the enjoyment of their hunting grounds. They objected most seriously to being placed and kept on a reservation, and that objection assumed the form of a hostile resistance to the plan and policy of the United States.
The question of amity being a mixed question of law and fact, we have, as in former cases, set out in detail the circumstances of the depredations, the reports and correspondence of public officers, both civil and military, and extracts from public documents which have, in the judgment of the court, a bearing upon the inquiry as to whether during the time covered by the several depredations the defendant Indians were in a state of amity, and have deduced from such evidence the ultimate conclusion that the Indians were not in a state of amity within the meaning of the act of 1891.
We therefore dismiss the petition for want of jurisdiction.