**KARUK TRIBE OF CALIFORNIA,**
**Plaintiff–Appellant,**

v.

Carol McConnell AMMON, Leslie Ammon, Elsie McCovey Bacon, Julia Lauretta Bartow, Ollie Roberts Foseide, Bonita Bacon Green, Janice M. Green, Dorothy Williams Haberman, Richard L. Haberman, Evelina Hoffman, Mary Gist Jackson, Martin Kinder, Sr., Rachel L. Knight, Ernest Lewis, Jr., Annie Mitchell Love, Ardith McConnell, Michael McConnell, Robert B. McConnell, Walter C. McKinnon, Thelma W. McLaughlin, Steven J. Metcalfe, Edward E. Mitchell, Veta Gillespie Mitchell, Gertrude V. Mollier, Edward Moore, David E. O'Neill, Herbert L. O'Neill, Barbara E. Orcutt, Lawrence E. Orcutt, David Eric Severns, Maria E. Tripp, and Kathryn Ichelson Wild, Plaintiffs–Appellants,

and

**Yurok Indian Tribe, Plaintiff–**
**Appellant,**

v.

**United States, Defendant–Appellee,**

and

**Hoopa Valley Tribe, Defendant–**
**Appellee.**

Nos. 99–5002, 99–5003, 99–5006.

United States Court of Appeals, Federal Circuit.

April 18, 2000.

Dennis J. Whittlesey, Jackson & Kelly, PLLC, of Washington, DC, argued for plaintiff-appellant, Karuk Tribe of California.

William C. Wunsch, of San Francisco, California, argued for plaintiffs-appellants, Carol McConnell Ammon, et al. Of counsel on the brief was Martin S. Putnam, Law Offices of Martin Putnam, of Oakland, California. Of counsel was Jonathan F. Putnam, Laws Offices of Martin Putnam.

John R. Shordike, of Alexander & Karshmer, of Berkeley, California, argued for plaintiff-appellant, Yurok Indian Tribe. With him on the brief was Curtis G. Berkey.

John A. Bryson, Attorney, Appellate Section, Environment and Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellee, United States. With him on the brief were Lois J. Schiffer, Assistant Attorney General; Susan V. Cook and Thomas L. Halkowski, Attorneys. Of counsel on the brief was John Jasper, Attorney, Office of the Solicitor, U.S. Department of the Interior, of Washington, DC.

Thomas P. Schlosser, Morisset, Schlosser, Ayer & Jozwiak, of Seattle, Washington, argued for defendant-appellee, Hoopa Valley Tribe. With him on the brief was K. Allison McGaw.

Before NEWMAN, RADER, and SCHALL, Circuit Judges.

Opinion for the court filed by Circuit Judge RADER. Circuit Judge PAULINE NEWMAN dissents.

RADER, Circuit Judge.

The United States Court of Federal Claims denied the motions for summary

judgment filed by the plaintiffs, the Karuk Tribe of California, the Yurok Indian Tribe, and a group of individual Indians led by Carol McConnell Ammon. *See Karuk Tribe of California v. United States,* 41 Fed.Cl. 468 (1998). At the same time, the trial court granted motions for summary judgment filed by the defendant and the defendant-intervenor, the United States and the Hoopa Valley Tribe. The Court of Federal Claims determined that plaintiffs did not possess a vested, compensable property interest in the Hoopa Valley Indian Reservation. Because the trial court correctly held that plaintiffs never had a compensable property interest the 1988 Hoopa–Yurok Settlement Act did not take any private property of the plaintiffs. Therefore, this court affirms.

## I.

This case concerns Indian reservation lands in the northwest corner of California. These lands lie in the Hoopa Valley between the Salmon Mountains and the lower Klamath River. The current Hoopa Valley Reservation is a square comprising about ninety thousand acres, and about twelve miles long on a side.[1] The Trinity River runs north through the square and joins the Klamath, there flowing southwest, just below the town of Weitchpec on the northern boundary of the square. The Klamath turns abruptly northwest at its junction with the Trinity and runs through groves of Redwood trees into the Pacific Ocean. A strip of land two miles wide on the lower stretch of the Klamath, extending from the boundary of the square to the Pacific Ocean, was, from 1891 to 1988, also part of the reservation—the "addition."

An executive order set aside the square as an original Hoopa Valley Reservation on June 23, 1876. Another executive order added the addition to this reservation in 1891. In 1988, the Hoopa–Yurok Settlement Act severed the addition, making it a reservation for the Yuroks, and established the square as a reservation for the Hoopa Valley Tribe. *Hoopa–Yurok Settlement Act,* 25 U.S.C. §§ 1300i–1300i–11 (1994) (the Settlement Act). The plaintiffs claim that the Settlement Act took their property interests in the reservations.

A brief historical overview sets this case in perspective. All the parties in this case, other than the United States Government, are Indians. These Indians are now organized into the Karuk, Yurok, and Hoopa Valley Indian Tribes, or are individuals who have not elected to join any of these tribes. The Ammon Group plaintiffs state that they comprise "an identifiable group of California Indians, each of whom has an undivided interest in the Hoopa Valley Reservation as it existed before 1988, but who are not eligible for membership in the 'Hoopa Valley Tribe,' organized in 1980." The Karuk, Yurok, and Hoopa Indians share many elements of a common cultural, religious, and economic outlook. *See* A.L. Kroeber, *Handbook of The Indians of California* 6 (Dover ed.1976) (hereinafter, Kroeber).[2] Historically, the Yuroks resided along the lower Klamath, in what became the addition, while the Karuks resided along the upper Klamath, an area outside any reservation. Yurok means "down the river," while Karuk means "up the river." These names "coincide with the respective homelands." *Mattz v. Arnett,* 412 U.S. 481, 485, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973) (citing Kroeber in its original edition, Bulletin 78, Bureau of American Ethnology 1–97 (1925); S. Powers, *Tribes of California,* cc. 4 and 5, pub-

---

1. Perhaps owing to faulty surveying, the square had a "dog-leg" in its lower boundary until 1998, when the Hoopa Valley Reservation South Boundary Adjustment Act eliminated the irregularity. *See* Pub.L. 105–79, Nov. 13 1997, 111 Stat. 1527, as amended Pub.L. 105–256, section 6, Oct. 14, 1998, 112 Stat. 1896.

2. Kroeber and some other sources refer to the up-river Indians as "Karok."

lished as 3 Contributions to North American Ethnology 44–64 (1877), and various Reports of the Commissioner of Indian Affairs, e.g., the *1856 Report of the Commissioner of Indian Affairs* 249–250.) The Hoopa Valley Indians lived in the Hoopa Valley along the Trinity River. Therefore, the square—now the Hoopa Valley Indian Reservation—was historically the homeland of the Hoopas. The addition was the homeland of the Yuroks. Weitchpec, on the square's northern boundary, was originally a Yurok settlement.

On January 24, 1848, when James Marshall saw the sparkle of gold on the South Fork of the American River in northern California, the native population of California was about five times as large as the settler population. By September 4, 1850, when California became the 31st state, the settlers easily outnumbered the natives. *See* Byron Nelson, Jr., *Our Home Forever: A Hupa Tribal History* 47 (1978) (hereinafter, *Hupa* ). To relieve the tensions between the stagnant native and the exploding settler populations, the United States appointed commissioners in 1851 to negotiate treaties with the California Indians. These commissioners negotiated eighteen treaties with the Indians, setting aside about 7.5 million acres of California land for Indian use. These treaties, however, required ratification by the United States Senate. The Senators from California opposed these treaties. The Senate considered the treaties in secret session, but never ratified them. These treaties were, therefore, always a nullity. Indeed, they were filed away from public view in 1852, and not seen again until 1905.[3]

Meanwhile, settlers attracted to California by gold were succeeded by others at-

tracted by fertile land. Violence erupted amongst miners, farmers, Indians, and the U.S. Army. To quell the violence, Congress authorized the President "to make five military reservations [with no more than twenty-five thousand acres in each] ... for Indian purposes." Act of March 3, 1853, 10 Stat. 238. The same Act appropriated funds for moving the "Indians in California" to the reservations. *Id.* Under this authority, the United States by executive order established an Indian reservation in 1855 on a strip of land on the lower Klamath River, in Yurok territory. 2 *Executive Orders Relating to Indian Reservations* 39 (1922). This Klamath River reservation was to "commenc[e] at the Pacific Ocean and extend[ ] 1 mile in width on each side of the Klamath River ... with the provision ... that ... a sufficient quantity be cut off from the upper end thereof to bring it within the limit of 25,-000 acres...." *Id.*

The Hoopa refused to move to this reservation. *Hupa,* at 65. Violence between settlers and Indians escalated, and the U.S. Army had to be reinforced. See *Painter v. United States*, 33 Ct.Cl. 114, 1800 WL 2032 (1897). Finally, Congress stepped in again, and on April 8, 1864, authorized the President, "at his discretion," to set apart four tracts of land "to be retained by the United States for purposes of Indian Reservations, which shall be of suitable extent for the accommodation of the Indians of said state...." Act of April 8, 1864, 13 Stat. 39 (the 1864 Act).

On August 12, 1864, Austin Wiley, the federal Government's Superintendent of Indian Affairs for the State of California, signed a "[t]reaty of peace and friendship

---

**3.** Bruce S. Flushman and Joe Barbieri, *Aboriginal Title: The Special Case of California,* 17 Pac. L.J. 409 (1986). In one of these 1851 treaties, the "Poh-lik, or lower Klamath [now Yurok], the Peh-tsick or upper Klamath [now Karuk], and the Hoo-pah or Trinity river Indians" agreed to maintain peace with the United States and with each other, to submit to

the "exclusive jurisdiction, authority, and protection of the United States," and to settle upon a reservation. In exchange, the Unites States promised to supply certain reservation services and, *inter alia*, specified numbers of blankets, items of clothing, and farm and cooking implements. *Hupa,* at app. I.

between the United States Government and the Hoopa, South Fork, Redwood, and Grouse Creek Indians." *Hupa,* at 89. This treaty, which was not presented to Congress for ratification, purported to obligate the United States to set aside "for reservation purposes for the sole use and benefit of the tribes of Indians herein named, or such tribes as may hereafter avail themselves of the benefit of this treaty, the whole of Hoopa valley." *Id.*

On August 21, 1864, Wiley published at Fort Gaston, in the Hoopa Valley, a proclamation that he had "this day located an Indian reservation, to be known and called by the name and title of the Hoopa Valley Reservation." 2 *Executive Orders Relating to Indian Reservations* 38. Almost thirteen years later, on June 23, 1876, President Ulysses S. Grant established, under the 1864 Act, the "Hoopa Valley Indian Reservation." *Id.* This executive order defined the boundaries of the square and "set [it] apart for Indian purposes." *Id.* The valuable resources of that parcel of land, today not gold but timber, give rise to the dispute before this court.

## II.

This litigation is the latest attempt by plaintiffs to receive a share of the revenues from timber grown on the square. Since 1950, the Secretary of the Interior has dispersed those revenues only to Indians who were members of the Hoopa Valley Tribe. In fact, the Hoopa Valley Tribe came into existence in 1950 with membership limited to those allotted land on the square, non-landholders voted in by the Tribe, and long-time residents of the square with a prescribed degree of native Hoopa parentage. *See Short v. United States,* 202 Ct.Cl. 870, 486 F.2d 561, 562 (Ct.Cl.1973) (*Short I*). The Hoopas were

the only group of the Indians on the reservation organized into a recognized tribe at the time of the initial *Short* litigation (which was not "short" at all). The plaintiffs in *Short I* were primarily Yuroks who had lived on the addition or their descendants, who sought to share in the revenue from Hoopa Valley reservation timber. *See Short v. United States,* 12 Cl. Ct. 36, 40 (1987).

In the *Short* litigation, the United States Court of Claims [4] decided that all Indians who lived anywhere on the reservation (including the addition) were "Indians of the reservation" entitled to share equally in the timber revenues from the square. *Short I* at 568. Later *Short* cases set standards to identify "Indians of the reservation." *See Short v. United States,* 202 Ct.Cl. 870, 486 F.2d 561 (Ct.Cl.1973), 228 Ct.Cl. 535, 661 F.2d 150 (Ct.Cl.1981), 719 F.2d 1133 (Fed.Cir.1983). The Settlement Act nullified the *Short* rulings by establishing a new Hoopa Valley Reservation:

> [T]he area of land known as 'the square' ... shall ... be recognized and established as the Hoopa Valley Reservation. The unallotted trust land and assets of the Hoopa Valley Reservation shall thereafter be held in trust by the United States for the benefit of the Hoopa Valley Tribe.

25 U.S.C. § 1300i–1(b) (1994). A necessary effect of the Settlement Act was thus to assure payment of the timber revenues from the square exclusively to the "Hoopa Valley Tribe."

The Settlement Act also partitioned the Hoopa Valley Reservation into two exclusive parts, the Square, or the Hoopa Valley Reservation, *see id.,* and the Addition, or the Yurok Reservation, *see* 25 U.S.C. § 1300i–1(c). Establishment and transfer

**4.** In 1982 after the enactment of the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25, the United States Claims Court assumed cases originally filed in the United States Court of Claims. The United States Claims Court was renamed the United States Court of Federal Claims in Pub.L. No. 102–572, 106 Stat. 4506 (1992).

of these lands was contingent upon waiver of claims against the United States arising under the Settlement Act by both the Hoopas and Yuroks. *See* 25 U.S.C. §§ 1300i–1(a)(2)(A)(i) & (c)(4). Those not included in these two tribes could either elect membership in one of them, or receive a payment of $15,000. *See* 25 U.S.C. § 1300i–5. The Settlement Act also specified that the Court of Federal Claims would have jurisdiction over any claims asserting the Act to be a taking under the Fifth Amendment. *See* 25 U.S.C. § 1300i–11. The Hoopa accepted the Settlement Act and waived their rights; the Yurok did not.

The Karuk, Yurok, and Ammon Group filed separate complaints in the Court of Federal Claims alleging that the Settlement Act was a taking of their vested property interests in the land and the resources of the Hoopa Valley Reservation. All three groups contend, inter alia, that the 1864 Act and later events vested them with compensable rights which the Settlement Act has taken from them. Alternatively, plaintiffs argue that they have compensable rights based on their continuous occupation of lands later incorporated into the Hoopa Valley Reservation. *See Karuk,* 41 Fed.Cl. at 469–70. The Court of Federal Claims consolidated the three cases, *see Karuk Tribe of California v. United States,* 27 Fed.Cl. 429, 433 (1993), and permitted the Hoopa Valley Tribe to intervene as a defendant. *See Karuk Tribe of California v. United States,* 28 Fed.Cl. 694, 698 (1993). The parties conducted discovery and filed cross-motions for summary judgment. *See Karuk,* 41 Fed.Cl. at 470–71. As noted above, the trial court denied plaintiffs' motion for summary judgment and granted summary judgment in favor of the United States, after concluding that the plaintiffs did not possess a vested compensable property interest in the Hoopa Valley Indian Reservation. *See id.* at 477. This appeal followed.

### III.

■ This court has jurisdiction over an appeal from a final judgment of the United States Court of Federal Claims, and reviews a grant of summary judgment independently, construing the facts in a light most favorable to the non-moving party. *See Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1107 (Fed.Cir.1992). This court upholds summary judgment only when the record shows both no genuine issue of material fact and entitlement of the moving party to judgment as a matter of law. *See* 28 U.S.C. § 1295(a)(3) (1994); *Good v. United States,* 189 F.3d 1355, 1360 (Fed. Cir.1999). In this case, the pertinent facts are not in dispute. This court reviews issues of statutory interpretation under a de novo standard of review. *Kane v. United States,* 43 F.3d 1446, 1448 (Fed.Cir. 1994).

■ Only Congress can "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3. In other words, only an Act of Congress can grant a right of permanent occupancy as opposed to permissive occupancy. But the allocation of rights to land between non-natives and the native population of North America has occasioned much litigation, which has defined the principles which govern the rights granted to Indians by the United States:

1. Indian title, or "right of occupancy," is a right "to roam certain territory to the exclusion of any other Indians and in contradistinction to the custom of the early nomads to wander at will in the search for food." *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 338–39, 65 S.Ct. 690, 89 L.Ed. 985 (1945); *Cramer v. United States,* 261 U.S. 219, 227, 43 S.Ct. 342, 67 L.Ed. 622 (1923).

2. The United States may extinguish Indian title by "purchase or con-

quest." *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 585–88, 5 L.Ed. 681 (1823).

3. The United States may terminate Indian title—a permissive right of occupancy—"without any legally enforceable obligation to compensate the Indians." *Tee–Hit–Ton Indians v. United States,* 348 U.S. 272, 279, 75 S.Ct. 313, 99 L.Ed. 314 (1955); *United States v. Alcea Band of Tillamooks,* 329 U.S. 40, 46, 67 S.Ct. 167, 91 L.Ed. 29 (1946).

4. Permissive occupation does not grant legal rights. *See Hynes v. Grimes Packing Co.,* 337 U.S. 86, 101, 69 S.Ct. 968, 93 L.Ed. 1231 (1949).

5. An Act granting permanent, rather than permissive, occupancy, must expressly create those rights. *See Tee–Hit–Ton,* 348 U.S. at 278–79, 75 S.Ct. 313. However, "[t]here is no particular form for congressional recognition of Indian right of permanent occupancy. It may be established in a variety of ways but there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation." *Id.* at 278–79, 75 S.Ct. 313. "When Congress intends to delegate power to turn over lands to the Indians permanently, one would expect to and doubtless would find definite indications of such a purpose." *Hynes,* 337 U.S. at 104, 69 S.Ct. 968. Congressional silence does not delegate the right to create, or acquiesce in the creation of, permanent rights. *See Confederated Bands of Ute Indians v. United States,* 330 U.S. 169, 176, 67 S.Ct. 650, 91 L.Ed. 823 (1947).

7. The President has no authority to convey any interest in public lands without a clear and definite delega-

tion in an Act of Congress. See Sioux*Sioux Tribe of Indians v. United States,* 316 U.S. 317, 325, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942).

8. An Indian reservation created by Executive Order of the President conveys no right of use or occupancy "beyond the pleasure of Congress or the President." *Hynes,* 337 U.S. at 103, 69 S.Ct. 968.

 Plaintiffs assert a taking of their alleged property rights in the square. A takings claim calls for a two-step analysis. First, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a "stick in the bundle of property rights." If a plaintiff possesses a compensable property right, a court proceeds to the second step. Under that second step, a court determines whether the governmental action at issue constituted a taking of that "stick." *See M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir.1995). The second step of the analysis, an intensely factual inquiry, includes consideration of the character of the governmental action, the economic impact of the action on the claimant, and the reasonable expectations of the claimant. *See Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631. (1978).

Before examining the alleged property deprivation, therefore, this court first examines the nature of the plaintiffs' property rights in the assets of the Hoopa Valley Reservation. The object of this examination is to determine whether plaintiffs in fact had property interests within the meaning of the Fifth Amendment.

### IV.

 Plaintiffs contend that they have compensable vested rights in the

square that spring from the 1864 Act and subsequent events. These rights, if indeed possessed by plaintiffs, would qualify as property under the Fifth Amendment, since the term "property" as used in the Taking Clause includes all rights inhering in ownership, including the right to possess, use, and dispose of the property. *See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).

This court thus examines the nature of the rights granted plaintiffs by the 1864 Act. As already noted, "[w]hen Congress intends to delegate power to turn over lands to the Indians permanently, one would expect to and doubtless would find definite indications of such a purpose." *Hynes,* 337 U.S. at 104, 69 S.Ct. 968. The 1864 Act lacks language creating a vested interest for Indians. Section 2 of the 1864 Act provides:

> [T]here shall be set apart by the President, and at his discretion, not exceeding four tracts of land, within the limits of said state, to be retained by the United States for purposes of Indian reservations, which shall be of suitable extent for accommodation of the Indians of said state, and shall be located as remote from white settlements as may be found practicable, having due regard to their adaptation to the purposes for which they are intended. . . .

Most importantly, Section 2 states that the President, "at his discretion," can create up to four tracts of land for reservations. Further on, Section 2 allows the President to enlarge a reservation "as in the opinion of the President may be necessary." As the Supreme Court noted when interpreting the 1864 Act, "[t]he terms of this enactment show that Congress intended to confer a discretionary power." *Donnelly v. United States,* 228 U.S. 243, 256, 33 S.Ct. 449, 57 L.Ed. 820 (1913). In short, the statutory language provides the

President with the discretion to create Indian reservations. Further, the 1864 Act states expressly that the United States "retained" the land. Nothing in the language of the 1864 Act demonstrates a "definite intention by congressional action," *Tee–Hit–Ton,* 348 U.S. at 278–79, 75 S.Ct. 313, to create a vested interest in the Indians who would reside on the reservations created under the Act.

When two Presidents exercised their discretion under the 1864 Act, their Executive Orders that created the Hoopa Valley Reservation contained no language expressly vesting rights in the Indians. In his Executive Order of June 23, 1876, creating the initial Square of the Hoopa Valley Reservation, President Ulysses S. Grant simply described the Reservation's bounds and indicated that the reserved land is "withdrawn from public sale and set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in California, by act of Congress approved April 8, 1864." Exec. Order June 23, 1876. The Reservation's extension through an Executive Order of President Benjamin Harrison on October 16, 1891 used similar language, stating that the new land was "set apart for Indian purposes, as one of the Indian reservations authorized" under the 1864 Act. Exec. Order Oct. 16, 1891. Neither Order demonstrates a definite intention by the United States to confer property rights upon the Indians of the Reservation. In addition, as noted in *Hynes,* 337 U.S. at 103, 69 S.Ct. 968, a President may only confer by Executive Order rights that Congress has authorized the President to confer. Thus, because the 1864 Act itself did not authorize the President to confer a vested interest upon the Indians but "retained" the land, neither President Grant nor President Harrison had authority to create vested Indian rights in the Hoopa Valley Reservation.

The conduct of the United States under the 1864 Act further demonstrates that the

Act did not create any compensable property interests for the Indians. As the Supreme Court noted in *Donnelly*,

> [i]t has been seen that Presidents Grant, Hayes, Garfield, Arthur, Cleveland, and Harrison, successively, acted with respect to one or more of [the 1864 Act] reservations upon the theory that the act of 1864 conferred a continuing discretion upon the Executive; orders were made for altering and enlarging the bounds of the reservations, restoring portions of their territory to the public domain, and abolishing reservations once made, and establishing others in their stead; and in numerous instances Congress in effect ratified such action.

*Donnelly*, 228 U.S. at 257, 33 S.Ct. 449. For example, the Tule River Reserve was created under the 1864 Act by Executive Order of President Grant. *See* Exec. Order Jan. 9, 1873. The Tule River Reserve's boundaries were changed by Executive Order, *see* Exec. Order Oct. 3, 1873, and, on August 3, 1878, by Executive Order of President Rutherford B. Hayes, the entire Tule River Reserve was restored to public domain. *See* Exec. Order Aug. 3, 1878. An act that confers such broad discretion–discretion to create and terminate reservations, or parts of reservations, by fiat–does not create compensable rights in such reservations.

Plaintiffs contend, however, that Congress' desire to establish "permanent peace" through the 1864 Act shows that the 1864 Act conferred ownership rights upon the Indians. The plaintiffs are correct that the purpose of the 1864 Act was to stop the conflict in California between the white settlers and the Indians. However, an intent to create "permanent peace" does not mean that the 1864 Act created any permanent occupancy rights. The Act implemented its "peace" purpose, not by giving the Indians vested rights, but by giving the President broad discretion to create reservations under the 1864

Act. As noted in *Donnelly*, 228 U.S. at 256, 33 S.Ct. 449,

> Congress could not reasonably have supposed that the President would be able to accomplish the beneficent purposes of the enactment if he were obligated to act, once for all, with respect to the establishment of the several new reservations that were provided for, and were left powerless to alter and enlarge the reservations from time, in the light of experience,

and thus, "Congress and the Executive practically construed the act of 1864 as conferring a continuing authority upon the latter, and a large discretion about exercising it." In short, the 1864 Act sought to achieve "permanent peace" by giving the President broad discretion, rather than by conferring upon the California Indians vested property rights.

## V.

Appellants argue that, even if the 1864 Act itself created no permanent property rights for Indians, later legislative and judicial actions have made and confirmed such rights. The 1864 Act and the executive orders that created the reservation gave the Indians a right to occupy the land. Rights of occupancy, however, do not constitute compensable property interests unless specifically recognized as ownership by an Act of Congress. *See Tee–Hit–Ton*, 348 U.S. at 289, 75 S.Ct. 313. Appellants have not shown this specific recognition. Indeed, the "permanent" status of a reservation is not immutable, nor does it grant any permanent rights to the Indians thereon. Congress can terminate a reservation it had earlier established. *See Mattz*, 412 U.S. at 505, 93 S.Ct. 2245. On a reservation created by executive order, such as the Square, Indians have only those rights of occupancy granted by the sovereign. *See Tee–Hit–Ton*, 348 U.S. at 279, 75 S.Ct. 313. Thus,

the occupancy rights in this case "may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians." *Id.*

Plaintiffs seize on the language in several cases to buttress their claims for vested rights, asserting that compensable property rights may be granted by relatively imprecise legislation or treaty language. The isolated quotes from those cases, however, do not lead to the conclusion that the Indians have compensable rights in the square. In *United States v. Klamath & Moadoc Tribes,* 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938), for instance, the Supreme Court decided that the phrase "set apart as a residence" "did not detract from the tribes' right of *occupancy.*" 304 U.S. at 123, 58 S.Ct. 799 (emphasis added). As already noted, however, a right of occupancy is not a compensable property interest. In *Klamath & Moadoc Tribes* Indians sought compensation for land obtained from the United States by treaty, but which the Government "mistakenly" gave to private developers. The Indians considered the United States' offer of limited compensation inadequate. The Court declared that the United States had only a moral, not a legal, obligation to compensate the Indians. Reiterating the basic principle that compensable property interests must be expressly assigned, the Supreme Court noted that "[s]ave to the extent that Congress may authorize, the government's dealings with Indian tribes are not subject to judicial review." *Klamath & Moadoc Tribes v. United States,* 296 U.S. 244, 255, 56 S.Ct. 212, 80 L.Ed. 202 (1935) (citing *Lone Wolf v. Hitchcock,* 187 U.S. 553, 567, 568, 23 S.Ct. 216, 47 L.Ed. 299 (1903)). Similarly, in *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 406, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), the phrase "held as Indian lands are held" did not, by itself, suffice to give hunting and fishing rights to Indians.

The Supreme Court narrowly defined the rights granted by that phrase only as authorization for the Indians "to maintain on the new lands ceded to them as a reservation their way of life which included hunting and fishing." *Id.* These examples do not, therefore, establish that anything less than specific granting language recognizes compensable property rights.

The occasional appropriation of funds by Congress to the reservation for various purposes also does not represent, as plaintiffs assert, the clear-cut vesting of permanent rights required by *Tee–Hit–Ton* for compensation. These appropriations show no more than a "repeated recognition of the reservation status of the land." *Mattz,* 412 U.S. at 505, 93 S.Ct. 2245. These Acts appropriated funds to pay evicted settlers for their improvements to the land that became the Hoopa Valley reservation, Act of March 3, 1865, 13 Stat. 538; to pay a physician, a blacksmith and assistant, a farmer, a teacher, and a carpenter for services on the reservation, Act of July 27, 1868, 15 Stat. 221, and to pay the traveling expenses of superintending agents, Act of April 10, 1869, 16 Stat. 36. These superintending Acts do not grant permanent rights. *Cf. Shoshone Tribe v. United States,* 299 U.S. 476, 495, 57 S.Ct. 244, 81 L.Ed. 360 (1937) (permanent occupancy rights on Shoshone land granted to Arapahoes based on a series of statutes "recognizing the Arapahoes equally with the Shoshones as occupants of the land"). Appropriations for maintenance expenses cannot be interpreted as recognition of a reservation as the permanent property of its Indian residents.

Plaintiffs also assert that the settlement of their claims under the California Indians' Jurisdictional Act of 1928, 25 U.S.C. § 651 et. seq., recognizes their permanent and compensable rights. The 1928 Act gave the United States Court of Claims jurisdiction to hear claims of the Indians of California for "equitable relief" against the

United States. *See* 25 U.S.C. § 652 (1994).[5] In particular, the 1928 Act provided a route for the Indians to seek compensation for the United States' disregard of the eighteen unratified treaties of 1852. *See* 25 U.S.C. § 653 (1994). However, the Act specifically reduced the Indians' compensation by the amount the United States had paid for the "support, education, health, and civilization of Indians in California, including purchases of land." *Id.* This setoff did not indicate recognition of compensable rights in the land of the reservation. As the Court of Claims made clear in a case settling Indian claims under the 1928 Act,

> This case does not involve the payment for land of which the Indians had a cession, or use and occupancy. No legal claim under any treaty or act of Congress setting aside land for the use of the Indians of California can be sustained. The decree can only be for a fixed amount of compensation. There has been no taking which under the Constitution would require just compensation to be paid and therefore would involve interest. The amount awarded would only be in full settlement of a recognized equitable claim which the Congress has ordered the Court to ascertain, and, after ascertainment, to enter a decree.

*Indians of California v. United States,* 98 Ct.Cl. 583, 600, 1942 WL 4378 (1942). As required by the 1928 Act, the Court of Claims reduced the Indians' compensation by $1.25 per acre for lands that were "set aside by the United States for the plaintiff Indians as reservations and otherwise, by Executive Orders, acts of Congress or otherwise...." *Indians of California v. United States,* 102 Ct.Cl. 837, 1944 WL 1079 (1944). Nothing in the 1928 Act or its judicial enforcement, however, makes this setoff a permanent grant of the reservation land, with associated vested rights. The setoff was actually just a reduction in an amount gratuitously offered by the United States, for reasons of conscience, to the Indians. The 1928 Act did not reach the standard of a "definite intention ... to accord legal rights [beyond rights of] ... permissive occupation." *Tee–Hit–Ton,* 348 U.S. at 279, 75 S.Ct. 313.

### VI.

Plaintiff Yuroks also argue that their tribe's continuous occupancy and use of the joint reservation and its resources demonstrate their compensable interests. This argument would be difficult for either the Yuroks or the Karuks to sustain on historical grounds, and has been dismissed repeatedly on legal grounds. *Tee–Hit–Ton,* 348 U.S. at 289, 75 S.Ct. 313.

Yuroks can, at best, claim only "Indian title" to part of the lands of the formerly joint Hoopa Valley reservation. The traditional territory of the Yuroks, or lower-Klamath Indians, was along the coast of the Pacific Ocean near the mouth of the Klamath River, as well as along the river itself. A part of these traditional homelands became the addition to the Hoopa Valley Joint Reservation in 1891. The 1988 Settlement Act severed this addition and made it an exclusive Yurok reserva-

---

**5.** "All claims of whatsoever nature the Indians of California ... may have against the United States by reason of lands taken from them ... by the United States without compensation, or for the failure or refusal of the United States to compensate them for their interest in lands ... which the United States appropriated to its own purposes without the consent of said Indians, may be submitted to the United States Court of Federal Claims by the attorney general of the State of California acting for and on behalf of said Indians for determination of the equitable amount due said Indians from the United States; and jurisdiction is conferred upon the United States Court of Federal Claims to hear and determine all such equitable claims of said Indians against the United States and to render final decree thereon."

25 U.S.C. § 652 (1994).

tion. Both as a matter of history and as a matter of law, the record does not support the Yuroks' claim, by "immemorial occupancy," to Indian title to the Hoopa Valley itself, site of the square.

Karuks, the upper Klamath Indians, have even less claim to Indian title to the lands of the Hoopa Valley reservation. The Karuks admit they never relocated to the Hoopa Valley reservation after it was established, but retreated into high ground away from the Klamath river. After gold-seeking intruders had left, the Karuks returned to their habitat along the upper Klamath. The record before this court, moreover, contains no evidence that either Yuroks or Karuks have even a claim to Indian title to the Hoopa Valley itself.

## VII.

■ Finally, plaintiffs assert that passage of the Indian Mineral Leasing Act of 1927, 25 U.S.C. §§ 398a–398e (1994), acknowledged their title to executive order reservation lands. Plaintiffs raise this issue for the first time in this appeal. Only rarely will an appellate court entertain issues not clearly raised in the proceedings below. See *Boggs v. West*, 188 F.3d 1335, 1337 (Fed.Cir.1999). This rule ensures that "litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." *Hormel v. Helvering*, 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941). In the absence of a general rule on considering issues raised for the first time on appeal, the Supreme Court has left the question to the discretion of this court. See *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). In some instances, courts of appeals have permitted consideration when such issues present only legal, not factual, questions. See, e.g., *Bellotti v. Baird*, 428 U.S. 132, 143–44 n. 10, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *White v. De-*

*partment of the Army*, 720 F.2d 209, 211 (D.C.Cir.1983); *Pegues v. Morehouse Parish School Bd.*, 706 F.2d 735, 738 (5th Cir.1983). Because interpretation of the 1927 Act is a legal question, this court elects to consider plaintiffs' assertion.

■ The 1927 Act states:

The proceeds from rentals, royalties, or bonuses of oil and gas leases upon lands within Executive order Indian reservations ... shall be deposited ... to the credit of the tribe of Indians for whose benefit the reservation ... was created or who are using and occupying the land

25 U.S.C. § 398b (1994). Plaintiffs argue that the three-year legislative history of the 1927 Act evinces a change from a sharing of a part of the royalties with state governments to one of allocating all royalties to a trust for the Indians, and contend that this legislative history shows that Congress recognized equitable Indian title to the reservation lands. See Note, *Tribal Property Interests in Executive–Order Reservations: A Compensable Indian Right*, 69 Yale L.J. 627, 632–33 (1960). Even assuming that the legislative history does contain the alleged alterations in tentative bill language, these deliberations within the legislative branch do not affect anything beyond the subject of the 1927 Act—mineral royalties. Because it is empowered to dispose of public property, Congress can allocate the benefits of reservation lands without also recognizing title. See *United States v. Jim*, 409 U.S. 80, 93 S.Ct. 261, 34 L.Ed.2d 282 (1972) (1933 Congressional Act adding certain lands in Utah to the Navajo Reservation and setting aside mineral royalties for Indians did not create property rights). Indeed, fifteen years after passage of the 1927 Act, the Supreme Court discerned no title-granting power in the Act. See *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 330–31, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942); *United States v. Southern Pacific*

*Transportation Co.,* 543 F.2d 676, 687 (9th Cir.1976). The 1927 Act merely confirms that Congress can, and will, grant any portions of any rights to reservation lands as it wishes, while still retaining title.

### VIII.

 The United States may extinguish Indian title by "purchase or conquest." *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) at 585–88, 5 L.Ed. 681. Alternatively, Indian occupancy may be extinguished by the government without compensation, unless an Act of Congress has specifically recognized the Indians' ownership rights. See *Tee–Hit–Ton,* 348 U.S. at 289, 75 S.Ct. 313. Even if plaintiffs could establish Indian title to the lands in dispute, the 1864 Act and subsequent actions of the United States do not show that the plaintiffs possessed any compensable property interests in the Hoopa Valley reservation. *See id.* at 279, 75 S.Ct. 313; *United States v. Alcea Band of Tillamooks,* 329 U.S. at 46, 67 S.Ct. 167.

Because plaintiffs have not shown possession of compensable property rights, this court need not examine whether the 1988 Settlement Act took or extinguished any rights. For these reasons, this court affirms the trial court's summary judgment.

### COSTS

Each party shall bear its own costs.

*AFFIRMED*

PAULINE NEWMAN, Circuit Judge, dissenting.

It is not tenable, at this late date in the life of the Republic, to rule that Native Americans living on a Reservation are not entitled to the constitutional protections of the Fifth Amendment. *See* Act of June 27, 1952, Pub.L. No. 82–414 as amended, 8 U.S.C. § 1401:

> The following shall be nationals and citizens of the United States at birth: .... (b) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: Provided, That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property.

The jurisprudence of conquest, set forth in *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), has no applicability to this case. This case is not concerned with Indian title deriving from aboriginal occupancy as against title derived from James I, *see* 21 U.S. (8 Wheat.) at 587; it is concerned solely with Reservation lands duly established by governmental action, and today's property interests, in constitutional terms, of the Indian occupants of Reservation lands. It is a case of first impression; and its holding is incorrect as well as unjust.

The Hoopa–Yurok Settlement Act of October 31, 1988 (the source of this litigation) recognized the Indians' property interests in the Joint Reservation. In providing that the Court of Federal Claims has jurisdiction of compensation claims arising from the 1988 Act, 25 U.S.C. § 1300i–11, Congress recognized that its restructuring of the Joint Reservation could give rise to claims under the Fifth Amendment. The interests of the Yurok and Karuk tribes [1] in the Joint Reservation did not arise from any asserted tribal title of antiquity, the claim rejected in *Johnson v. McIntosh,* but from acts of the United States as sovereign, the authority endorsed in *Johnson v. McIntosh.*

The recognition of property interests is fundamental to the culture as well as the

---

1. I do not discuss separately the claims of the unaffiliated Native Americans who are also appellants, for the principles here stated do not depend on whether those affected by the Settlement Act of 1988 are members of an organized tribe.

law of this nation. Recognition of these Indians' interests in the Joint Reservation property that they have occupied for over a century is not a mere "matter of conscience," as the panel majority holds, but a matter of law and right, cognizable in the courts. *See Romero v. Kitsap County*, 931 F.2d 624, 627 n. 5 (9th Cir.1991) ("[P]laintiffs claim that they were deprived of rights secured under both the Constitution and specified Indian treaties. Claims of deprivation of constitutional rights are, of course, cognizable under section 1983, as are, under specified circumstances, claims for deprivations of treaty-based rights.") (citations omitted). Monetary claims of just compensation based on deprivation of property by governmental action are similarly cognizable in the Court of Federal Claims.

The Court of Federal Claims incorrectly required "title" as a threshold requirement of Fifth Amendment applicability to a compensable interest in the Joint Reservation. The presence of a compensable interest of constitutional dimension does not depend on whether title to the Joint Reservation is held by its Indian occupants or by the United States as their trustee. The issue is whether the tribes that were consigned to this Joint Reservation, by the congressional Act of April 8, 1864 and the implementing executive orders of June 23, 1876 and October 16, 1891, have property interests that are subject to the Constitution. Congress correctly thought so, and designated the judicial path for review of just compensation claims arising from the 1988 Settlement Act. My colleagues on this panel, holding that these Indians have no compensable interest in the Joint Reservation and its resources, deny history, statute, and precedent. Thus I must, respectfully, dissent.

***The Joint Reservation***

Since 1891 the Hoopa Valley, Yurok (Klamath), and Karuk tribes have been assigned to the Joint Reservation established pursuant to the 1864 Act of Congress and the implementing executive orders of 1876 and 1891. The historical record shows documents and promises, consideration and military pressure, whereby these California Indians agreed to cease warfare against the white settlers and inhabit reserved lands. As stated in *Short v. United States*, 202 Ct.Cl. 870, 486 F.2d 561 (Ct.Cl.1973):

> It is perfectly plain that from the outset in 1864 all involved understood that the reservation was intended for an undetermined number of tribes including the Hoopas and Klamath, and that the authorities repeatedly acted on this assumption.

*Id.* at 565. These Indians are not interlopers into this land, but peoples designated to occupy the Joint Reservation. Their unchallenged possession thereof for over a century, by acts of the United States, created property interests within the cognizance of the Fifth Amendment.

The panel majority, ruling that no such interest exists, relies on the fact that the executive orders establishing and enlarging the Joint Reservation were not ratified as treaties. However, as discussed in *Tee–Hit–Ton v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), the existence of a treaty is not necessary; what is necessary is congressional intent to establish a permanent reservation, and the actual establishment of such a reservation. Indeed, congressional intent as to permanence is not illuminated by whether there was a treaty, for in 1871 the government stopped negotiating treaties with the native tribes while continuing to instruct the President to establish reservations:

> Although the Executive Branch engaged in treaty-making with the Indian tribes before 1871, in that year Congress decided that it would no longer negotiate treaties with the tribes. Congress thus

suspended the entire process of treaty negotiation with the Indian tribes and delegated power to the President to create specified numbers of Indian reservations. 25 U.S.C. § 71. "Reservations established after 1871 were accordingly created either by statute or, until Congress ended the practice in 1919, by executive order."

*Parravano v. Babbitt,* 70 F.3d 539, 545 (9th Cir.1995) (quoting William C. Canby, *American Indian Law* 17–18 (2d ed.1988)).

The Act of 1864 delegated to the President the authority to create four reservations for the California native tribes. The panel majority errs in relying on the absence of a treaty embodying the executive orders of 1876 and 1891 as negating any tribal property interest in the Joint Reservation. These orders, carrying out the 1864 Act and other instructions of Congress, were designed to effect a permanent peace between the native peoples of this region and the large influx of prospectors and settlers, with whom there were serious confrontations. The relocation and containment of warring Indians upon designation of the Joint Reservation was plainly intended as a permanent home. There is no suggestion in the historical record that a temporary arrangement was contemplated by either the United States government who established it or the Native Americans who complied with it.

The Settlement Act of 1988, now partitioning the Joint Reservation, provided compensation to the displaced Indians. The issue raised in this lawsuit is the adequacy of the compensation. The Karuk tribe points out that its circumstances differ from those of the Yuroks, and the unaffiliated Indians point to their particular circumstances. The panel majority holds that none of these plaintiffs has a compensable interest, and thus can not challenge the justness of the compensation. I do not agree. Neither title in fee nor a ratified treaty is a requirement of Fifth Amendment applicability to Native American claims arising under the Constitution.

### The Fifth Amendment Right is Not Limited to Titular Ownership

The court also reasons that a constitutionally cognizable taking could not occur because these lands had not been permanently transferred to these Indians, the court referring to the absence of "title" to the Reservation lands. I need not belabor that title is not requisite to Fifth Amendment rights, and that property interests subject to just compensation are not limited to real property held in fee. Property interests of Fifth Amendment relevance have arisen in many forms other than title to real estate. *See, e.g., Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) and cases cited therein (economic regulation may effect a taking); *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (taking is evaluated by examining the action's "justice and fairness"); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (taking of trade secrets cognizable under the Fifth Amendment); *United States v. General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945) (taking of a leasehold was a taking for Fifth Amendment purposes); *Preseault v. United States,* 100 F.3d 1525 (Fed.Cir.1996) (conversion of a railway easement into a recreational easement was a taking); *Avenal v. U.S.,* 100 F.3d 933 (Fed.Cir.1996) (change in salinity of water in oyster beds due to government water diversion project was a taking); *Shelden v. United States,* 7 F.3d 1022 (Fed.Cir.1993) (taking of a security interest when it was made unenforceable by government seizure of the property).

On any definition of the property rights and interests cognizable under the Fifth Amendment, those of the Indian plaintiffs

constitute an interest subject to just compensation. Takings law does not exclude beneficial interests. The establishment of this Joint Reservation with the United States as trustee was for the benefit of these native peoples, *see United States v. Mitchell,* 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (discussing the "general trust relationship between the United States and the Indian people"), whose right of permanent and peaceful occupancy has been confirmed by time as well as by governmental action. Beneficial interests in real property are not defeated simply because the fee is held by the trustee. A trust relationship does not authorize the trustee to evict the beneficiary.

The 1988 Settlement Act deprived the plaintiff tribes of occupancy rights in the major land area of the Joint Reservation, in favor of the Hoopa Valley tribe, as well as depriving the plaintiffs of the right established in the *Short v. United States* litigation to share in the timber income of that area, in favor of the Hoopa Valley tribe. *See generally Calder v. Bull,* 3 U.S. (3 Dall.) 386, 388, 1 L.Ed. 648 (1798) (Chase, J.) ("It is against all reason and justice" to presume that the legislature has been entrusted with the power to enact "a law that takes property from A and gives it to B") (quoted in *Eastern Enterprises,* 524 U.S. at 523, 118 S.Ct. 2131). These plaintiffs do not here challenge the government's authority to reallocate the Joint Reservation land and natural resources; they ask only that the compensation therefor be just. *See First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) ("[The Takings Clause] is designed not to limit the governmental interference with property rights *per se,* but rather to secure compensation in the event of otherwise proper interference amounting to a taking").

The Supreme Court has recognized that the fact of Indian occupancy, accompanied by the retention of title in the United States in trust "for the purpose of Indian reservations," the words of the 1864 Act, establishes a compensable interest. In *Shoshone Tribe of Indians v. United States,* 299 U.S. 476, 496, 57 S.Ct. 244, 81 L.Ed. 360 (1937) the Court explained:

> Title in the strict sense was always in the United States, though the Shoshones had the treaty right of occupancy with all its beneficial incidents. What those incidents are, it is needless to consider now. The right of occupancy is the primary one to which the incidents attach, and division of the right with strangers is an appropriation of the land pro tanto, in substance, if not in form.

The Shoshone tribe had protested the government's forced division of their reservation and its resources with the Arapaho tribe. In holding that just compensation was required, the Court again stated that the Shoshone tribe had

> the right of occupancy with all its beneficial incidents; that, the right of occupancy being the primary one and *as sacred as the fee,* division by the United States of the Shoshone's right with the Arapahos was an appropriation of the land pro tanto;

*United States v. Shoshone Tribe of Indians,* 304 U.S. 111, 115, 58 S.Ct. 794, 82 L.Ed. 1213 (1938) (emphasis added). The Court stressed that "title in the strict sense" was not controlling, and that the retention of legal title by the United States as trustee did not free it from the obligation to pay just compensation to the tribe:

> [A]lthough the United States always had legal title to the land and power to control and manage the affairs of the Indians, it did not have the power to give to others or to appropriate to its own use any part of the land without rendering, or assuming the obligation to pay, just compensation to the tribe, for that would

be, not the exercise of guardianship or management, but confiscation.

*Id.* at 115, 58 S.Ct. 794. *See also Chippewa Indians of Minnesota v. United States,* 301 U.S. 358, 375, 57 S.Ct. 826, 81 L.Ed. 1156 (1937) ("Our decisions, while recognizing that the government has power to control and manage the property and affairs of its Indian wards in good faith for their welfare, show that this power is subject to constitutional limitations and does not enable the government to give the lands of one tribe or band to another, or to deal with them as its own").

In 1927 Congress acted to assure recognition of the permanence of Indian rights in reservations that were established by executive order. By 1927 Congress had already enacted laws to assure that the profits of logging and mineral extraction on reservation lands were used for the benefit of the Indian residents. *E.g.,* 41 Stat. 34 (1919) (mineral rights); 36 Stat. 857 (1910) (timber rights). The 1927 Act added oil and gas revenue rights, and also prohibited the President from altering the boundaries of executive order reservations without congressional approval. "Changes in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress." Pub.L. No. 69–702, 44 Stat. 1347, (codified at 25 U.S.C. § 398a–398e). The government in its brief now challenges the significance of the 1927 Act, a mysterious challenge, for since 1927 the record shows no reservation lands taken or realigned without just compensation in Fifth Amendment terms. *See, e.g.,* the Act of Sept. 30, 1968, 82 Stat. 885, 888 (lands of Salt River Pima–Maricopa Indian Community and Fort McDonald Apache Indian Community taken for Orme Dam); Act of June 24, 1974, 88 Stat. 266, 269 (transfer of lands to Cocopah Tribe in compensation for rights-of-way). *See* Felix S. Cohen, *Handbook of Federal Indian Law* (1982)

at 496–497 n. 202 (collecting statutes). The argument, pressed by the panel majority, that reservations established by Act of Congress and implemented by executive order are somehow inferior in their property attributes, is without force or support.

A recent example of recognition of Fifth Amendment applicability to Indian property rights in reservation lands is seen in *Hodel v. Irving,* 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987), wherein the Court invalidated a provision of the Indian Lands Consolidation Act of 1983. The Court ruled that the Act's escheat of small estates to the tribe required compensation to the Indian heirs under the Takings Clause. Although the land was held "in trust" by the United States, the right of descent and devise by the Indian holders of the allotment was recognized. The recognition of reservation lands as property subject to the laws of inheritance, although nominally held by the United States in trust, contravenes my colleagues' theory that no compensable interest arises from beneficial occupancy.

The panel majority relies heavily on *Tee–Hit–Ton v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), extending it to situations to which it did not and does not apply. At issue in that case were 350,000 acres of land and 150 square miles of water in Alaska, which the members of the Tee–Hit–Ton clan claimed to have occupied and used from time immemorial. The Court explained that these natives' use of this land and water was like "the use of the nomadic tribes of States Indians," and drew an explicit distinction from the rights derived from occupancy of a "recognized" reservation. The Court explained that Indian rights in recognized reservations do not require any particular legal form, but that there must be governmental action and intention to form a reservation. *Id.* at 278–79, 75 S.Ct. 313. The Court found this action and intention absent for the areas claimed by the Tee–Hit–Ton clan.

In contrast, the Joint Reservation is a recognized reservation formed under congressional and executive authority. *See Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973) (affirming permanent status of the Joint Reservation). The claims herein do not remotely resemble those ·discussed in *Tee–Hit–Ton.* It does not defeat their claims that the Yurok or Karuk tribes occupied some of these areas in prehistory, as the panel majority observes. That does not convert their eviction from most of the Joint Reservation into a non-compensable act. While conquest may extinguish aboriginal claims, *see Johnson v. McIntosh, supra,* the legislative adjustment of long-established rights in recognized reservations is today subject to the protection of the Constitution. *See United States v. Shoshone Tribe of Indians,* 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). The panel majority misapplies the holding of *Tee–Hit–Ton* as negating any right to compensation deriving from the partition of the land and resources of the Joint Reservation.

The plaintiff Indians possessed not only the right to occupy the land of the Joint Reservation, but also the right to share in its timber income, litigated in the *Short v. United States* cases, *supra.* Compensable interests arise from natural resources as well as land, *see United States v. Klamath and Moadoc Tribes,* 304 U.S. 119, 123, 58 S.Ct. 799, 82 L.Ed. 1219 (timber); *United States v. Shoshone Tribe,* 304 U.S. at 116, 58 S.Ct. 794 (minerals and timber). All parties agree that the 1988 Act was enacted to overrule *Short.* However, the 1988 Act was not based on a theory that these Indians do not have a compensable interest in this resource; the panel majority errs in so ruling.

### Summary

The Act of 1864 and executive orders of 1876 and 1891 that created the Joint Reservation, and the plaintiff Indians' possession and occupancy thereof, created property interests of constitutional cognizance. The plaintiffs have a compensable interest in the land and resources of the Joint Reservation, and not the temporary and permissive status attributed by the panel majority. The 1988 Settlement Act itself . recognizes the entitlement of the Indians of the Joint Reservation to just compensation. Thus the plaintiffs are entitled, by constitutional right and statutory direction, to judicial review of the issue of just compensation. I respectfully dissent from my colleagues' contrary ruling.